UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| SETH A. McGEE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:16CV9 PLC |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Seth McGee seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying his applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.[2] The Court has reviewed the parties' briefs and the administrative record, including the hearing transcript and medical evidence. For the reasons set forth below, the case is reversed and remanded.

### I.  *Background and Procedural History*

In June 2012, Plaintiff, then thirty years of age, filed applications for Disability Insurance Benefits and Supplemental Security Income alleging he was disabled as of November 20, 2011 as a result of: back injury and lumbar fusions, Brugada syndrome, neurofibromatosis, optic glioma, "extra accessory pathway," migraines, and depression.[3]  (Tr. 103, 181-86, 189-95). The

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 9).
[3] The SSA denied Plaintiff's earlier applications for Social Security benefits on January 18, 2011. (Tr. 257).

1

Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 127-31, 134-35).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on February 20, 2014. (Tr. 60-102). At the hearing, Plaintiff testified that he was divorced and shared physical custody of his two children, ages eight and twelve. (Tr. 66, 67). Plaintiff previously worked as a pharmacy technician, but he stopped working after back surgery in November 2011 due to "the pain and weight restrictions." (Tr. 68, 70). Plaintiff had a driver's license and was able to drive without restrictions. (Tr. 67).

In regard to his medical impairments, Plaintiff testified that his most recent back surgery was in March 2012 and he last saw his orthopedic surgeon, Dr. Parker, in December 2013. (Tr. 73). According to Plaintiff, Dr. Parker prescribed him Tramadol and hydrocodone and "sa[id] there's pretty much nothing he can do so just come back in a year, he'll re-scan." (Tr. 73). Plaintiff stated that his back pain was located in the "lower lumbar region" and "radiates down my legs." (Tr. 75). On a typical day it became so severe that he would need to recline or lie down twice a day for about forty-five minutes. (Tr. 75-76). Plaintiff testified that he could either sit or stand for approximately twenty minutes before his back started hurting and he would have to change positions. (Tr. 76, 87). Plaintiff went to the emergency room about three weeks earlier for back pain and received a shot. (Tr. 77).

Plaintiff testified that he saw a neurologist for treatment of his headaches once every three months.[4] (Tr. 73). Plaintiff's neurologists were still "trying to get the right combination of medicine, to control the headaches," which he suffered about three times per week. (Tr. 74). When Plaintiff suffered a headache, he would lie down in a dark room for about two hours to

---

[4] Plaintiff explained that his treating neurologists changed "because they always move." (Tr. 72).

2

relieve the pain. (Tr. 74-75). Along with his headaches, Plaintiff usually experienced nausea and/or vomiting. (Tr. 84). Plaintiff's neurologist had prescribed amitriptyline and Topamax. (Tr. 73).

When the ALJ asked Plaintiff about his heart condition, he explained: "I just have episodes where it just starts racing really fast and it makes me feel dizzy, and I feel like I'm going to pass out." (Tr. 81). The rapid heartbeats last "a couple minutes," but the dizziness "could last 15 minutes afterwards. I have blacked out before from it." (Tr. 82). Plaintiff did not believe the medication prescribed by his cardiologist helped. (Tr. 83). He experienced these episodes about four times per week. (Tr. 86). Plaintiff testified that he saw his cardiologist, Dr. Flaker, once every three months and had undergone two cardiac ablations. (Tr. 74).

Plaintiff testified that his neurofibromatosis was "stable," but the vision in his right eye was "blurry." (Tr. 77, 78). Plaintiff stated that he had an inoperable tumor on his right optic nerve, which his doctors tried to shrink with chemotherapy. (Tr. 87).

Plaintiff was able to dress himself, although it was "painful," and he was able to shower and shave. (Tr. 78). Plaintiff testified that his impairments affected his ability to exercise and "play with the kids." (Tr. 79). Because he was no longer able to "run around with" his children, they would "play puzzles, board games" at the kitchen table. (Id.). Plaintiff was able to prepare microwave meals for his children, but his eldest son cleaned the house. (Tr. 80-81). His brother or mother usually did his grocery shopping because "pushing a car, walking, after a while it just hurts too much." (Tr. 80). His mother helped take care of his children about four days per month when Plaintiff's "heart racing, migraine, severe back pain" rendered him incapable of caring for them. (Tr. 84).

3

A vocational expert also testified at the hearing. (Tr. 89-100). The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work history who was:

> Able to lift and carry up to 20 pounds occasionally, 10 pounds frequently, stand and or walk for 30 minutes at a time for approximately six hours in an eight-hour workday, can sit for 45 minutes at a time for a total of two hours of an eight-hour workday with normal breaks, can climb ramps or stairs occasionally, can never climb ladders, ropes, scaffolds, can stoop, kneel or crouch occasionally, can never crawl, with occasional reaching in the front, laterally, overhead, and low places and by low places I mean below the knee. The individual would have limited field of vision on the right side with difficulty reading normal print but retains sufficient visual acuity to read large print, work with large objects, able to perform tasks with occasional reading, has a visual field to avoid ordinary hazards in the work place. The person must avoid exposure to extreme cold, avoid concentrated exposure to vibration, avoid exposure to moisture, must also avoid exposure to hazardous machinery which is defined as unshielded moving machinery and avoid exposure to unprotected heights.

(Tr. 92). The vocational expert testified there were no jobs in the regional or national economy that this hypothetical individual could perform because she found "it very difficult to find work that would meet that with the [occasional] reaching and the posturals….." (Tr. 93).

When the ALJ asked the vocational expert to consider the same individual "except with frequent reaching in front, laterally, overhead, low places," the vocational expert testified that such individual could perform the jobs of garment sorter, folding machine operator, and apparel stock checker. (Tr. 93-94). Additionally, the vocational expert opined that if the hypothetical individual were only "able to lift up to 10 pounds occasionally," he could work as a dowel inspector, patcher, or lens inserter. (Tr. 98). However, these jobs would be precluded if the individual were limited to "occasional reaching in front, laterally, overhead and low places." (Id.).

In a decision dated September 16, 2014, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920[5] and found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 20, 2011, through the date of this decision[.]" (Tr. 42). The ALJ found that Plaintiff had the following severe impairments: "Lumbar Spine Disorders and status-post [sic] fusion at L4-L5," Brugada syndrome, neurofibromatosis, optic glioma, migraine headaches, and obesity. (Tr. 32).

After reviewing Plaintiff's testimony and medical records and finding that his "statements concerning the intensity, persistence, and limiting effects, of [his] symptoms are not entirely credible," the ALJ found that Plaintiff had the residual functional capacity (RFC) to:

> Perform sedentary work, as defined in 20 CFR 404.1567(a) and 416.967(a), but is limited to lifting up to 10 pounds occasionally, sit for six hours, and stand/walk up to two hours in an eight-hour workday with normal breaks. The claimant is limited to no more than frequent reaching in front, laterally, overhead, and low places (i.e., below the knees), occasional stooping, kneeling, crouching, and climbing ramps or stairs, and must never crawl or climb ladders, ropes, or scaffolds. The claimant has limited field of vision on the right side with difficulty reading normal print, but retains sufficient visual acuity to read large print, work with large objects, perform tasks with occasional reading, and has the visual fields to avoid ordinary hazards in the workplace. The claimant must avoid exposure to extreme cold, moisture, hazardous machinery (i.e., unshielded moving machinery), as well as unprotected heights, and must avoid concentrated exposure to vibrations.

(Tr. 34-35). Finally, the ALJ found that Plaintiff was unable to perform his past relevant work but could perform other jobs that existed in significant numbers in the national economy. (Tr. 41).

---

[5] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on January 29, 2016 (Tr. 1-5). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III. *Discussion*

Plaintiff claims that substantial evidence did not support the ALJ's finding that he was not disabled. (ECF No. 20 at 32-33). More specifically, Plaintiff contends that the ALJ erred in: (1) failing to find that his "problems with his neck and symptoms in his arms" constituted severe impairments; and (2) assigning "very little weight" to the opinion of his treating orthopedic surgeon, Dr. Parker. The Commissioner counters that: (1) the ALJ did not err in failing to discuss Plaintiff's neck and arm problems because Plaintiff "never alleged or testified that these conditions were disabling or caused any work-related limitations"; and (2) the ALJ properly discounted Dr. Parker's opinion. (ECF No. 27 at 6, 13).

#### A. *Neck and arm impairments*

Plaintiff asserts that the ALJ erred in failing to consider whether Plaintiff's cervical spine and upper extremity problems were severe impairments. (ECF No. 20). In response, the Commissioner argues that the ALJ was not required to discuss plaintiff's neck and arm problems because Plaintiff neither included them in his applications for benefits nor testified to them at the hearing. (ECF No. 27). The Commissioner further argues that any error in not addressing the severity of Plaintiff's alleged neck and arm impairments was harmless because Plaintiff failed to demonstrate that: (1) his medically determinable neck impairment was severe; and (2) that his arm-related symptoms were medically determinable and severe. (Id.).

At step two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). See also 404 C.F.R. § 404.1520(c). A severe impairment is a medically determinable impairment that "significantly

limits [the claimant's] physical or mental ability to do basic work activities."[6]  20 C.F.R. § 404.1521(a). Although the plaintiff has "the burden of showing a severe impairment that significantly limited [his] physical or mental ability to perform basic work activities[,]…the burden of a claimant at this stage of the analysis is not great." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). See also Kirby, 500 F.3d at 708 ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard[.]") (internal citation omitted).

Plaintiff first complained about arm and shoulder numbness to his cardiologist, Dr. Greg Flaker, on August 10, 2012. (Tr. 915-16). Dr. Flaker noted that the arm and shoulder numbness was "associated with mild motor clumsiness. This lasted about 5 minutes then resolved." (Tr. 916). Dr. Flaker was concerned about, but later ruled out, the possibility that Plaintiff had suffered a "TIA." (Id.). On August 15, 2012, Plaintiff went to the emergency room with complaints of headaches and numbness on the left side of his face and left arm. (Tr. 996). Doctors noted no tenderness in Plaintiff's neck. (Id.). An MRI of Plaintiff's cervical spine on August 20, 2012 revealed "minimal multilevel spondylosis most pronounced at C6-C7." (Tr. 1061-62).

When Plaintiff saw his orthopedic surgeon, Dr. Jeffrey Parker, on September 5, 2012, he complained of "some numbness in his arms," and Dr. Parker noted that Plaintiff "is not having any neck complaints so I don't think that this is cervical in nature." (Tr. 977). Likewise, at a checkup on September 13, 2012, Dr. Flaker noted that Plaintiff reported "episodes o[f] numbness are occurring in both arms with some weakness." (Tr. 917-18). Dr. Flaker increased Plaintiff's

---

[6] Basic work activities include, among other things, physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling, as well as various mental and physical activities. 20 C.F.R. § 416.921(b).

metroprolol, restarted Lisinopril, and ordered an EMG and nerve conduction study, which were normal. (Tr. 919, 978).

When Plaintiff returned to Dr. Parker's office on October 10, 2012, he reported continued numbness and pain in "both arms equally," and "neck is sore as well." (Tr. 378). Plaintiff had about 70% expected range of motion in his neck, and an MRI "does show some mild bulging centrally at C6-7" and "some diffuse degenerative changes noted at C3-4, C4-5, C5-6, and C6-7 but nothing severe." (Tr. 978). At a follow-up appointment on October 17, 2012, Dr. Parker found "mild diffuse degenerative changes with a tiny disc bulge at C6-7 but really no significant stenosis or neural compression noted," recommended an epidural steroid injection at C6-7, and referred him to Dr. James Newton, a pain management specialist. (Tr. 1102-03).

Dr. Newton saw Plaintiff on October 30, 2012, noted that Plaintiff was "suffering increasing neck pain and right upper extremity numbness and tingling for the last two to three months," and administered a cervical epidural steroid injection. (Tr. 1104-05). Approximately one week later, Plaintiff informed Dr. Newton that he was experiencing "residual neck and shoulder pain but feels that the tingling has significantly improved." (Tr. 1104). Dr. Newton diagnosed Plaintiff with cervicalgia and prescribed a trial of Mobic and six weeks' physical therapy. (Tr. 1105). When Plaintiff followed up with Dr. Newton in November 2012, he complained of "persistent right-sided neck pain limiting rotation and extension of his neck" but reported substantial improvement in the tingling and numbness. (Tr. 1106-07). Dr. Newton diagnosed Plaintiff with cervicalgia and cervical stenosis, increased Plaintiff's Neurontin, and ordered right-sided cervical medial branch blocks at C4 through C7. (Id.).

In December 2012, Plaintiff followed up with Dr. Parker for treatment of his cervical pain. (Tr. 979). Plaintiff continued to suffer pain in his neck and occasional symptoms in his

arms. Dr. Parker noted that Plaintiff's neck was tender and he had "painful motion" with "only about 70% of expected neck motion." (Id.). Dr. Parker opined that Plaintiff "most likely [] has chronic cervical strain [with] perhaps some inflammation of his facet joints" and "cervical fusion would not be warranted." (Id.).

In March 2013, Plaintiff complained to Dr. Parker about pain in his neck and right arm. (Tr. 1128). Dr. Parker noted that Plaintiff's neck was tender, and he had "mild limitation of motion" and "only about 80% of expected neck motion because of pain and discomfort." (Id.). Dr. Parker wrote: "My impression is that the patient has cervical pain which is his major complaint today with some right upper extremity radicular complaints, perhaps due to some increasing stenosis in neck." (Id.). Dr. Parker did not think "there is going to be anything operatively we can do for his neck . . . and I think this is probably just a transient issue." (Id.).

At a follow-up appointment in June 2013, Plaintiff reported that his pain was "mostly still in neck." (Tr. 1131). Plaintiff's neck was tender, he experienced "mild pain with motion," and he had "70 degrees of forward flexion and 20 degrees of extension." (Id.). An MRI showed "a central disc protrusion at C6-7 which does not produce any significant spinal stenosis or neural compression" and "a mild right paracentral disc bulge at this level but nothing on the left side." (Id.). Dr. Parker ordered another epidural steroid injection. (Id.). That same month, Dr. Parker completed a form entitled "Attending Physician's Statement of Continued Disability,"[7] in which he listed Plaintiff's primary diagnosis as "chronic low back pain, post fusion," secondary diagnosis as cervical stenosis, and symptoms as "chronic back pain; neck and l[ef] arm pain." (Tr. 1091).

---

[7] At the hearing, Plaintiff testified that this form "related to disability pay from Wal-Mart, my previous employer." (Tr. 101).

10

At a check-up with his oncologist in October 2013, Plaintiff reported that his "chronic back and neck problems persist." (Tr. 1121). In December 2013, Dr. Parker noted that Plaintiff "still has some chronic neck pain. He has pain which limits his activities significantly and he cannot work." (Tr. 1133). Dr. Parker also wrote that Plaintiff experienced pain when moving his neck and "he is disabled by his neck pain, back pain, and cardiac arrhythmia . . . ." (Tr. 1133).

Plaintiff reported neck pain to the nurse practitioner at his oncologist's office on January 13, 2014. (Tr. 1147-48) However, at an appointment with his neurologist on January 23, 2014, Dr. Syed Shah wrote: "no arm/leg weakness, numbness or tingling/light headed or dizziness/ NO NECK PAIN." (Tr. 1159) (emphasis in original). Dr. Flaker's treatment notes from an appointment in February 2014 mentioned back pain but not neck pain. (Tr. 1169-70).

On June 26, 2014, Plaintiff met with a consultative examiner, Dr. Randy Foster. (Tr. 1175-1188). Dr. Foster examined Plaintiff and reviewed Plaintiff's "plethora of medical records," which Dr. Foster found "corroborate the allegations 100%." (Tr. 1187). Dr. Foster completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)," adopting all of the limitations prescribed by Dr. Parker. (Tr. 1175-80). He also completed a musculoskeletal pain diagram, on which he noted a stabbing sensation in Plaintiff's neck and upper back. (Tr. 1186). Dr. Foster observed that Plaintiff's "[r]ange of motion was normal in cervical spine," but his lumbar spine flexion as limited. (Id.).

In December 2014, Plaintiff saw Dr. Eddie Varghese in consultation with Dr. Parker. (Tr. 17-20). Prior to the appointment, Dr. Parker informed Dr. Varghese that Plaintiff "ha[d] neck pain and then also postlaminectomy syndrome status post interbody fusion at L4-5 and L5-S1." (Id.). Dr. Varghese described Plaintiff's condition as follows: "lumbar failed back surgery

11

syndrome with right lower extremity radiculitis that follows an L5-S1 dermatomal distribution. He has chronic neuropathic pain. He has bilateral sacroiliac joint pain worse on the right compared to the left." (Tr. 19). Dr. Varghese prescribed gabapentin and Tramadol and discussed the possibility of "neuro stimulation." (Id.). When Plaintiff followed up with Dr. Varghese in February 2014, his chief complaints were "continued back and leg pain." (Tr. 21-22).

The ALJ did not discuss Plaintiff's diagnoses of multilevel spondylosis, bulging disc, cervicalgia, or cervical stenosis in her decision. Relying on Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008), the Commissioner contends that the ALJ was not obligated to discuss these diagnoses or related symptoms because Plaintiff neither alleged them in his applications for benefits nor testified to them at the hearing.

Mouser is inapposite. There, the plaintiff argued that there was sufficient evidence in the record to alert the ALJ to his alleged mental impairment and trigger the ALJ's duty to develop the record, and he asked the court to remand his case for the ALJ to consider a recent report concerning his mental capacity. Id. at 636, 639. The Eighth Circuit acknowledged the ALJ's duty to fairly and develop the record, but found that the ALJ was "not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" Id. at 639 (quoting Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003)). The court concluded that the ALJ had no duty to investigate the plaintiff's mental capacity because "the record [was] lacking in evidence that would have put the ALJ on notice that [the plaintiff's] mental capacity may be at issue and that the ALJ fully and fairly developed the record based on the evidence before him." Id. at 639.

Here, unlike in <u>Mouser</u>, Plaintiff challenges the ALJ's failure to discuss certain conditions and find them to be severe impairments, not the ALJ's failure to develop the record. Additionally, whereas the plaintiff in <u>Mouser</u> could have claimed his mental impairment (low IQ) when he applied for benefits, the pain in Plaintiff's neck and the pain and numbness in his arms developed after he filed his applications.[8]

Finally, unlike the record in <u>Mouser</u>, the record in the instant case was replete was evidence of Plaintiff's neck and arm problems. Beginning in late 2012, Plaintiff frequently complained to his treating orthopedic surgeon, pain management doctor, and cardiologist about cervical pain and numbness in his arms. Several of Plaintiff's physical examinations revealed tenderness and reduced range of motion in Plaintiff's neck, and Plaintiff's MRI's revealed: "some mild bulging centrally at C6-7"; "minimal multilevel spondylosis most pronounced at C6-7"; and "degenerative changes of the cervical spine with very mild narrowing of the central spinal panel of C6-C7." In addition to spondylosis and degenerative changes, Plaintiff's physicians diagnosed him with cervicalgia and cervical stenosis and treated him with combinations of epidural steroid injections, nerve blocks, pain medications, and physical therapy. Given this "substantial and documented evidence," the question of Plaintiff's neck and arm problems "was squarely before the ALJ, obligating her to investigate these impairments further before evaluating plaintiff's RFC." <u>Becker v. Colvin</u>, Case No. 4:12CV82 FRB, 2013 WL 5337612, at *19 (E.D.Mo. Sept. 23, 2013). <u>See also</u> <u>Harper v. Colvin</u>, Case No. 1:14CV31 ACL, 2015 WL 5567978, at *5 (E.D.Mo. Sept. 22, 2015) (reversing because the ALJ failed to consider the plaintiff's borderline intellectual functioning despite significant evidence in the record supporting the presence of this impairment).

---

[8] Plaintiff filed his applications for benefits in June 2012, approximately two months before he first reported arm numbness to his cardiologist and four months before he informed Dr. Parker about neck pain.

The Commissioner argues that the ALJ's failure to discuss Plaintiff's neck and arm problems was harmless because "Plaintiff has not demonstrated that his neck impairment and purported arm-related symptoms resulted in any greater limitations than contained in the ALJ's RFC finding." (ECF No. 27 at 12). "A failure to find severe impairments at Step 2 may be harmless where the ALJ continues with the sequential evaluation process and considers all impairments, both severe and non-severe." Harper, 2013 WL 5567978 at *6.

Here, however, the harmless error standard does not apply because the ALJ did not discuss Plaintiff's neck and arm problems when formulating the RFC. See id. This failure is particularly significant in light of the vocational expert's testimony. In her original hypothetical question for the vocational expert, the ALJ limited Plaintiff to "occasional reaching in the front, laterally, overhead, and low places," and the vocational expert explained that such individual's job prospects were extremely limited because "most of the jobs that I am looking at do require greater than occasional reaching[.]" (Tr. 92-93). When the ALJ modified the hypothetical to allow "frequent reaching in front, laterally, overhead, low places," the vocational expert was able to identify several sedentary jobs, and the ALJ adopted this less restrictive RFC. (Tr. 93). Consequently, the ALJ's disability determination turned on her decision not to limit Plaintiff to occasional reaching based on Plaintiff's neck and arm impairments. For the reasons set forth above, the Court remands the case so that the ALJ may assess the nature, severity, and effects of Plaintiff's neck impairment and the pain and numbness in his arms.

B. *Treating physician*

Plaintiff also claims the ALJ failed to properly evaluate the opinion of his treating orthopedic surgeon, Dr. Parker. (ECF No. 20). The Commissioner counters that the ALJ

properly discredited Dr. Parker's opinion because it was inconsistent with his own clinical findings and those of Plaintiff's other medical providers. (ECF No. 27).

A treating physician's opinion regarding a plaintiff's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. Id. This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. See 20 C.F.R. §§ 404.1527(c), 416.927(c); Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir.1991). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c); 416.927(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

In October 2011, Plaintiff began seeing Dr. Parker for pain in his back and right leg after a L4-5 laminotomy and partial discectomy. (Tr. 447). Dr. Parker performed an L4-5 spinal fusion in November 2011 and an L4-5 rod placement in March 2012. (Tr. 379-82, 401-09, 1045). After the rod placement, Plaintiff followed up with Dr. Parker in April and June 2012 and reported that his leg pain was gone and his back pain was significantly improved. (Tr. 486, 487). In August 2012, an MRI of Plaintiff's cervical spine revealed "minimal multilevel spondylosis most pronounced at C6-7." (Tr. 1061-62).

When Plaintiff followed up with Dr. Parker in September 2012, he reported "some back aches when he overdoes it" and "some numbness in his arms as well." (Tr. 977). At that time, Plaintiff did not have neck complaints, so Dr. Parker did not believe the arm numbness was "cervical in nature." (Id.). However, when Plaintiff returned to Dr. Parker's office in October 2012, he continued to complain of numbness in his arms and hands, and reported that his "neck is sore as well." (Tr. 978). Dr. Parker noted that Plaintiff had about "70% of expected motion" and that an MRI "does show some mild bulging centrally at C6-7" and "some diffuse degenerative changes . . . but nothing severe." (Id.). The following week, Dr. Parker examined Plaintiff again and ordered an epidural at C6-7, which Dr. Newton administered on October 30, 2012. (Tr. 1102, 1104-05).

Plaintiff followed up with Dr. Parker in December 2012, and reported continued pain in his neck and "occasional symptoms in his arms." (Tr. 979). Dr. Parker noted that Plaintiff's neck was tender, he had "painful motion," and he had "only 70% of expected neck motion." (Id.). Dr. Parker opined that Plaintiff "most likely [] has chronic cervical strain w[ith] perhaps some inflammation of his facet joints" and "a cervical fusion would not be warranted." (Id.).

On March 14, 2013, Dr. Parker completed interrogatory questions in which he stated that he had treated Plaintiff for: low back pain; spondylosis, lumbar; post-laminectomy syndrome; and pseudoarthrosis. (Tr. 1089). Dr. Parker affirmed that: (1) Plaintiff's allegations that "he can sit for approximately 15 minutes and then he has to stand for 10 minutes before he can sit again because of his back pain" were "consistent" with Plaintiff's impairments; and (2) Plaintiff's back problems would likely "cause him to suffer from absenteeism to the extent that he will miss more than two days a month o[f] work because of chronic back pain." (Tr. 1089).

Dr. Parker next examined Plaintiff on March 20, 2013 and recorded Plaintiff's complaints of cervical pain "with some right upper extremity radicular complaints[.]" (Tr. 1110). Dr. Parker observed that Plaintiff's neck was tender and he had "mild limitation of motion, only about 80% of expected neck motion." (Id.). Dr. Parker opined that this is "probably just a transient issue" and stated that Plaintiff "does have a lot of general aches and pains in his neck and low back and also has neurofibromatosis." (Id.).

In June 2013, Plaintiff returned to Dr. Parker's office and reported continued pain, "mostly still in neck," and chronic low back pain. (Tr. 1113). Dr. Parker noted that a recent MRI showed "straightening of cervical spine" and "degenerative changes of the cervical spine with very mild narrowing of the central spinal panel of C6-7," and he ordered another epidural steroid injection. (Id.).

Five days later, Dr. Parker completed the "Attending Physician's Statement of Continued Disability." (Tr. 1091-92). In regard to Plaintiff's functional capabilities, Dr. Parker opined that Plaintiff could: sit, stand, or walk for thirty minutes at a time for a total of two hours per day; never lift or carry more than ten pounds; occasionally reach above shoulder, at waist/desk level, or below waist/desk level; and frequently use his fingers and hands. (Tr. 1092).

At a follow-up appointment in December 2013, Dr. Parker wrote: "[Plaintiff] still has some chronic neck pain. He still has pain which limits his activities significantly and he cannot work." (Tr. 1133). Dr. Parker's examination revealed: "back is tender"; "he has mild limitation of motion"; "neuro exam is normal"; "fully ambulatory"; "painful motion of his neck which I would rate at only about 80% of expected"; and lumbar exam "shows that he is able to forward flex only about 60 degrees and extend his back 15 degrees." (Id.). Dr. Parker concluded: "I don't think he is currently going to be able to work and he is disabled by his neck pain, back pain and cardiac arrhythmia which have required two ablations by Dr. Flaker at the University." (Id.).

In her decision, the ALJ acknowledged that the medical opinions of treating physicians are generally entitled to "special significance" but assigned "very little weight to Dr. Parker's multiple assessments[.]" (Tr. 40). The ALJ reasoned that Dr. Parker's opinions "are grossly inconsistent with his own clinical findings on physical examinations performed from 2011 through 2013, as well as the claimant's reports to all other treating physicians." (Id.). Additionally, the ALJ found that Dr. Parker's "extreme limitations are grossly inconsistent with the clinical findings made by other treating physicians that the claimant had a normal gait and station, was able to tandem walk, had 5/5 motor strength, sensation, reflexes, in all extremities, never mentioned he was shifting positions frequently or unable to maintain any position longer than 10-15 minutes." (Tr. 40).

Under the framework provided by the regulations, Dr. Parker's opinions were entitled to controlling weight. As an orthopedic surgeon, Dr. Parker was highly specialized in disorders of the spine. See Brown v. Astrue, 611 F.3d 941, 953 (8th Cir. 2010) ("Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist.") (quotation omitted); see also 20 C.F.R. §§ 404.1527(d)(5);

18

416.927(d)(5). It is also significant that Dr. Parker treated Plaintiff for over two years and examined him approximately twenty times between October 2011 and December 2013. See 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

While Dr. Parker's treatment notes often reflected that Plaintiff's gait and station were normal, he was able to tandem walk, and had 5/5 motor strength in all extremities, they also showed that Plaintiff had tenderness, pain, and limited range of motion in his neck and back. Further, Dr. Parker's opinion regarding Plaintiff's work-related limitations was based on Plaintiff's combined impairments. As Plaintiff's long-term orthopedist, Dr. Parker was in the position to provide a longitudinal perspective on Plaintiff's impairments, which, in addition to lumbar and cervical spine disorders, included neurofibromatosis, optic glioma, migraine headaches, Brugada syndrome, and obesity. See, e.g., Dunham v. Astrue, Case No. 1:12-CV-21 SNLJ, 2013 WL 384483, at*18 (E.D.Mo. Jan. 11, 2013) ("[T]he fact that plaintiff's gait and balance may have been normal on some examinations is not inconsistent with the opinion that plaintiff was limited in his ability to work eight hours a day due to his combination of chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, bilateral carpal tunnel syndrome, hypertension, diabetes mellitus, sleep apnea, depression, and obesity.").

To the extent the ALJ found that Dr. Parker's opinions were "grossly inconsistent with … the claimant's reports to all other treating physicians" and "the clinical findings made by other treating physicians," she failed to identify the statements and findings that contradicted Dr. Parker's opinion. (Tr. 40). The ALJ's nonspecific reference to conflicting statements and

findings do no constitute "good reasons" for discounting Dr. Parker's medical opinion.  See Reed v. Barnhart, 399 F.3d at 921-22.

The ALJ also discredited Dr. Parker's opinion because Plaintiff "never mentioned he was shifting positions frequently or unable to maintain any position longer than 10-15 minutes." (Id.).  However, a review of Dr. Parker's treatment notes reveals that his practice was to include only a brief summary of Plaintiff's general complaints (i.e., location, intensity, and duration of symptoms) and not to record specific limitations reported by Plaintiff.  The Court therefore finds that the ALJ failed to properly weigh Dr. Parker's opinions and thus failed to properly assess Plaintiff's disability claim such that substantial evidence does not support the ALJ's determination.  See, e.g., Gordon v. Astrue, 801 F.Supp.2d 846, 859 (E.D.Mo. 2011).

## IV. Conclusion

For the reasons stated above, the Court finds that the ALJ erred in failing to address Plaintiff's neck impairment and arm-related symptoms and in discounting the opinion of Plaintiff's treating physician.  Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

A judgment of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of September, 2017